# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 15, 2012 Session

### STATE OF TENNESSEE v. CLOIS DEAN ASBURY

**Direct Appeal from the Criminal Court for Knox County**
No. 87401      Bob R. McGee, Judge

**No. E2011-00431-CCA-R3-CD - Filed September 27, 2012**

A Knox County Criminal Court Jury convicted the appellant, Clois Dean Asbury, of driving under the influence (DUI), seventh offense; leaving the scene of an accident involving injury; and leaving the scene of an accident involving property damage greater than $400. In addition, the trial court found that he violated the implied consent law. After a sentencing hearing, the appellant received an effective sentence of two years, eleven months, and twenty-nine days to be served in confinement for the convictions. As a result of his violating the implied consent law, his driver's license was suspended for one year. On appeal, the appellant contends that (1) the trial court erred by allowing the prosecuting officer to testify as the State's fourth witness, (2) the trial court erred by refusing to dismiss the indictment or give a special jury instruction when the State lost evidence, and (3) the evidence is insufficient to support the convictions. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Michael G. Hatmaker (on appeal), Jacksboro, Tennessee, and Marcos M. Garza (at trial), Knoxville, Tennessee, for the appellant, Clois Dean Asbury.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Sarah Keith and Leon Franks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

At trial, Marquita Kiser Keck testified that on the night of August 9, 2006, she was stopped at a stoplight on Clinton Highway and waiting to turn left onto Schaad Road.  Keck's was the second car in line.  When the light turned green, Keck began turning left.  She said that something hit the right side of her car and that she looked back and saw a red pickup truck.  Keck stopped her car immediately and got out, but the truck was gone.  Keck suffered back and neck injuries as a result of the wreck, experienced pain for a few weeks, and was still seeing a chiropractor at the time of trial.  She said that a "huge hole" was in her passenger-side door, that some lights were broken, and that the damage exceeded $400.

James Bomar testified that he was stopped in front of Keck's car at the traffic light.  When he turned left, he saw a red pickup truck travel straight through the light.  He said that the truck "could have hit me first" but that it hit Keck's car.  Bomar said that he stopped to check on Keck and that she was "okay."  The red truck had black tinted windows, and Bomar thought it was a Ford Ranger.  The truck did not stop and traveled south on Clinton Highway toward downtown Knoxville.

Sergeant John Kylie of the Knoxville Police Department (KPD) testified that on the night of August 9, 2006, he was on patrol and heard Officer Eric Parks broadcast the description of a vehicle that had left the scene of an accident.  The vehicle was described as a red Ford Ranger extended cab pickup truck with front-end damage.  Sergeant Kylie drove north on Clinton Highway and noticed a truck matching the description stopped at the Gas Mart near the intersection of Clinton Highway and Merchants Drive.  Sergeant Kylie pulled into the parking lot and saw that the truck had front-end damage.  He parked behind the truck, got out of his patrol car, and walked to the front of the truck.  He said that the truck's passenger-side turn signal was broken and that a dent was in the bumper "with fresh paint transfer."

Sergeant Kylie testified that the appellant was sitting in the driver's seat and that another man was sitting in the passenger seat.  Sergeant Kylie described the men as "highly intoxicated."  He said that he asked the passenger to step out of the truck and that the passenger was "fidgety."  Sergeant Kylie handcuffed him for the officer's safety and had him sit down.  Sergeant Kylie read <u>Miranda</u> warnings to the appellant, and the appellant got out of the truck.  The appellant's eyes were bloodshot, and his speech was slurred.  Sergeant Kylie said the appellant stated that "they come down, got a steak at the Golden Coral and went and watched the ladies."  The appellant also told the officer that someone pulled out in front of him and that he turned around after the wreck.  However, the other vehicle was gone,

so the appellant drove to the Gas Mart. The appellant told the officer that he had consumed "several drinks'" and never said someone else was driving the truck. Sergeant Kylie said that he talked with the passenger and that the passenger "said the same things."

Sergeant Kylie testified that Officer Parks arrived and asked the appellant about his medical condition. Sergeant Kylie said that the appellant told them about his heart and back problems and that the officers "could tell he needed field sobriety tests to see if he was too intoxicated to drive." Sergeant Kylie talked with the appellant about the tests, but the appellant refused to take them. Based upon the appellant's actions, his having an odor of alcohol, his bloodshot eyes, and his being unsteady on his feet, Officer Parks arrested him. At that point, the appellant said for the first time that he had not been driving the truck. However, Sergeant Kylie did not believe the appellant. He explained,

> His buddy's said the same story he did, so it's -- it all makes sense. And with the timeline it makes sense. Okay. They're coming from the area. They've had some alcoholic -- or he's had some alcoholic beverages. And before they went and seen the ladies they went and got them a steak at the steakhouse. So all that added up. It told a complete story.

Sergeant Kylie said that he found an eighteen-pack of Miller Lite beer in the truck and that, in his opinion, the appellant was too intoxicated to drive.

On cross-examination, Sergeant Kylie testified that he was Officer Parks' direct supervisor. He acknowledged that he reviewed a video from Officer Parks' patrol car and Officer Parks' reports in order to prepare for his trial testimony. The appellant's statements on the night of August 9 were not included in Officer Parks' reports, and Sergeant Kylie did not file any reports related to the incident. Sergeant Kylie acknowledged that he could have filed a supplement to Officer Parks' reports but that he did not do so. When Officer Parks arrived, the appellant was sitting in the driver's seat of the truck, but the truck was not in motion. Nevertheless, Sergeant Kylie considered the appellant to be in control of the truck. Sergeant Kylie acknowledged that bloodshot eyes did not necessarily indicate impairment. However, under the circumstances, Sergeant Kylie thought the appellant was driving under the influence. On redirect examination, Sergeant Kylie testified that the appellant had physical control of the truck because he was sitting in the passenger seat with the keys in the ignition.

Officer Eric Parks of the KPD testified that about 10:30 p.m. on August 9, 2006, he responded to a car accident on Clinton Highway at Schaad Road. One vehicle was present, but the other vehicle had left the scene. Officer Parks said that Marquita Keck "spoke of

some injuries" and that her car's passenger-side door had "considerable damage." Officer Parks stated that he obtained a description of the missing vehicle from witnesses and that he "put that over the radio." Shortly thereafter, he heard that Sergeant Kylie had found the vehicle at the Gas Mart. Officer Parks drove to the Gas Mart and saw Sergeant Kylie talking with two people. He said, "I entered the scene half way into it. So [Sergeant Kylie] brought me up to speed with it." The officers determined that the appellant's truck had struck Keck's car and asked the appellant what happened. Officer Parks said the appellant stated that "[t]hey were going to see the ladies." Eventually, the appellant said he had been in an accident. Officer Parks stated that the appellant admitted he had been driving the truck and that "the passenger backed that story up too." Officer Parks could not remember if the appellant told him how much alcohol the appellant had consumed. However, the appellant was very unsteady on his feet and had very slurred speech. He refused to take field sobriety tests, so Officer Parks arrested him. Officer Parks read an implied consent form to the appellant, but the appellant refused to take a blood test. When Officer Parks placed the appellant in handcuffs, the appellant began complaining about aches and pains. Officer Parks called an ambulance, and the appellant was transported to a hospital. Officer Parks cited the appellant for driving under the influence (DUI).

Officer Parks acknowledged that he had a video camera in his patrol car, and the State played the video for the jury. We have reviewed the video. The video shows Officer Parks talking with witnesses at the scene of the wreck, driving to the Gas Mart, and getting out of his patrol car. Officer Parks walked out of the camera's view and talked with another officer. The officers asked the appellant where he had come from, and the appellant said he "had a steak" and "watched the ladies." One of the officers asked the appellant if he had had an accident, and the appellant did not answer. The officers told the appellant that he had front-end damage on his truck, walked the appellant into the camera's view for the first time, and showed him the damage. The appellant looked at the front of his truck and crossed his arms but did not say anything. One of the officers approached a man sitting on the ground with his hands handcuffed behind his back and asked for his name. The man said that his name was James Wiley and that he had been riding with the appellant. He said that the appellant had been traveling south and that a car turned in front of them. When the officers confronted the appellant with Wiley's information, the appellant admitted his truck hit the car and said, "I didn't think it hurt my truck that bad." The appellant said, "I stopped and I turned around and tried to follow them." He said the other driver "went down the street" and turned left. One of the officers asked if the appellant would take field sobriety tests, but the appellant said he had heart and back problems. The officer explained the tests to the appellant and asked if he wanted to attempt the tests. The appellant said "they hit me pretty hard" and refused to take the tests. The officer arrested the appellant.

On cross-examination, Officer Parks acknowledged that he did not know the

appellant's normal speech pattern. He also acknowledged that he never saw the appellant drive the truck. When Officer Parks arrived at the Gas Mart, the appellant was parked in a parking space properly.

Donna Nelson testified for the appellant that on the night of August 9, 2006, she and her boyfriend ate dinner at Harrison's restaurant in Clinton, Tennessee. The appellant was at the restaurant and was eating with a woman and a man. The appellant had worked with Nelson's boyfriend, but Nelson had never seen him before that night. As the appellant was leaving, he stopped and spoke with Nelson and her boyfriend. Nelson, who was sitting on the restaurant's patio about twenty feet away from the appellant's truck, watched the appellant's party walk to the truck. The woman sat in the driver's seat, and the appellant got into the backseat of the truck. Nelson said the appellant was pale.

On cross-examination, Nelson testified that the appellant told her he was not feeling well and needed to leave. The appellant did not have any trouble walking but acted like his chest was hurting. Nelson said she was concerned about him because "I actually thought he was having a heart attack or something." Nelson did not know what the appellant ate or drank at the restaurant, but she did not think he was intoxicated. She said the appellant left the restaurant "right before dark . . . . I would say 9:30-ish." She acknowledged that she did not know if the appellant dropped off the woman after he left the restaurant.

James Richard Wiley testified that on the evening of August 9, 2006, the appellant picked him up and they went to Harrison's. They arrived at the restaurant about 7:30 p.m. and were eating on the patio when Sharon Hammons walked to their table. Wiley consumed beer, but Hammons did not drink any alcohol. Wiley said Hammons asked if she "could get a ride back to Lake City," where she lived. The appellant told her yes and paid the bill. The appellant had ordered a steak but did not eat half of it because he was not feeling well. The three of them walked to the appellant's truck, and the appellant lay down in the backseat. Wiley sat in the passenger seat, and Hammons sat in the driver's seat. Wiley said that Hammons "wanted to run to Knoxville for a few minutes" and that they left the restaurant about 9:30 p.m. Hammons drove toward Knoxville, traveled through a green light at an intersection on Clinton Highway, and hit Keck's car. Hammons pulled over immediately. She and Wiley looked behind them for the car she hit but did not see it, so Hammons continued traveling south on Clinton Highway. She stopped at the Gas Mart. By that time, the appellant was sitting up and looking for his cellular telephone. Hammons took the keys out of the ignition, threw them onto the floor, and said she needed to go into the store. The appellant got out of the truck, but Hammons never returned. The police arrived five or ten minutes later.

On cross-examination, Wiley testified that he thought the appellant consumed two

beers that night and that they "circled" the Emerald Club parking lot before the wreck but did not go inside the club. He acknowledged that after the wreck, Hammons did not stop at any of the businesses near Schaad Road to report the wreck. He said he was "pretty intoxicated" that night and did not remember telling the police that the appellant was driving the truck. He said he told one of the officers that Hammons was driving. He said that he did not remember telephoning the district attorney's office on February 23, 2009, and reporting that the appellant was trying to get him to say that he was driving the truck on August 9, 2006. He said that he could have been drinking alcohol on February 23, 2009.

On redirect examination, Wiley testified that he was nervous when the police arrived at the Gas Mart, that he had a "crush" on Hammons, and that he did not want her to get into trouble. He acknowledged that he lied to the police officers.

Sharon Hammons acknowledged that at the time of the appellant's trial, she was in custody in Campbell County for violating a probation sentence she received for a forgery conviction. On August 9, 2006, Hammons was at Harrison's restaurant, saw the appellant and Wiley, and approached them. She said that she had "sipped on a beer prior to going to their table" and that she talked with them for about thirty minutes. Hammons said she left the restaurant with them and "got behind the wheel" of the appellant's truck. Wiley sat in the passenger seat, and the appellant lay down in the back because he was hurting. Hammons said that the men thought she was going to drive to Lake City but that she drove south toward Knoxville. Hammons hit Keck's car, and the men told her to pull over so they could call the police. Hammons was scared and stopped at a gas station. She said she "took off" and "left 'em holding the bag more or less." At the time of the wreck, Hammons had violated probation, had outstanding warrants, and did not want to go to jail. She said she decided to tell the truth because "I've ruined my life, I didn't need to ruin somebody else's life."

On cross-examination, Hammons acknowledged having prior convictions for theft but said she did not remember having a prior conviction for attempted burglary. She said that a friend dropped her off at Harrison's about 5:00 p.m. on August 9, 2006, and that she consumed two beers at the restaurant. Hammons knew Wiley but had never met the appellant. Wiley was intoxicated, but Hammons did not remember if the appellant consumed any alcohol. She left the restaurant with them about 8:00 p.m. and asked to drive so she could go to a house on Western Avenue in Knoxville. She said that she did not drive through the Emerald Club parking lot. After the wreck, Hammons stopped at the Gas Mart, left the truck, and telephoned Wayne Ellis. Ellis picked her up about fifteen minutes later. About one year before the appellant's trial, Hammons saw Wiley for the first time since the wreck. He told her that the appellant had been charged with DUI and was going to lose everything. Hammons met with Wiley and the appellant at her mother's home in Lake City and told them she would tell the truth. She said she decided to tell the truth because she did not want the

appellant "going down for something that I did."

Michael Bailey testified that he used to work with the appellant and that they were acquaintances. On August 9, 2006, he and his girlfriend went to Harrison's. As they were being seated, the appellant was leaving and complaining about chest pains. Bailey was sitting outside and saw the appellant get into the backseat of a truck. Wiley got into the truck on the passenger side, and a woman got into the front seat on the driver's side. The appellant left the restaurant about 9:00 p.m.

The appellant testified that on August 9, 2006, he picked up James Wiley in Lake City and that they arrived at Harrison's about 7:00 p.m. The appellant ate some steak and consumed one-half of a beer but was not feeling well and wanted to leave. Hammons approached their table, sat down, and started talking with them. The appellant did not know her, but she left with him and Wiley, who was intoxicated, about 9:20 p.m. The appellant lay down in the extended cab of his pickup truck and wanted to go home. Hammons said she would drive to Lake City, and Wiley sat in the passenger seat. The appellant thought he was having a heart attack or a panic attack, and he was going to call his wife in Lake City so she could pick him up and take him to the hospital. The appellant went to sleep. He said that when he awoke, Wiley and Hammons said, "'We hit somebody.'" The appellant told them to pull over and call the police. Instead, Hammons drove to the Gas Mart. He said they did not stop by the Emerald Club before the wreck. When asked why Wiley testified that they pulled into the Emerald Club parking lot, the appellant said Wiley "might have seen it going down Clinton Highway and thought about it."

The appellant testified that he was "shook up real bad" and that Hammons jumped out of the truck. The appellant got out of the truck but began searching it for his cellular telephone. When the police arrived and began asking him questions, he had a panic attack. He said he did not perform the field sobriety tests because of the panic attack and because he "didn't know what [the officer] was talking about." Regarding the blood test, he said, "It all happened so fast . . . I just cannot remember, sir. Everything was fuzzy." He said that he was not under the influence of alcohol and did not have physical control of the truck on the night of August 9, 2006.

On cross-examination, the appellant testified that he stopped drinking alcohol sometime in August 2006, before the wreck. However, he also stated that he consumed less than one-half of a beer on the night of August 9, 2006. He said he remembered telling one of the officers that he consumed a couple of beers that night, but he did not remember telling the police that he came to Knoxville to eat a steak and watch the ladies. He said he did not tell the officers that Hammons was driving the truck because he was in shock, and he acknowledged that he never reported to the district attorney's office that she was driving.

-7-

He also never stated at any prior hearings related to the case that Hammons was driving. He denied trying to persuade Wiley to say that Wiley was driving the truck.

Sandra Milsaps testified on rebuttal for the State that she was employed by the Knox County District Attorney's Office and sometimes worked the office's telephone switchboard. At 4:25 p.m. on February 13, 2009, Milsaps received a call from a James R. Wiley. Wiley gave Milsaps the appellant's name and the docket number for the appellant's case. He told her that he had been a passenger in the appellant's truck at the time of the wreck and that he had been asked by the appellant to say he was the driver. Wiley wanted to speak with the prosecutor and thought he could help the State's case. Milsaps took notes during her conversation with Wiley.

On cross-examination, Milsaps testified that she recorded a telephone number for Wiley. She did not remember if she got the number from the caller ID or if she got it directly from him. She acknowledged that the person claimed to be Wiley.

The jury convicted the appellant as charged of DUI, seventh offense, a Class E felony; leaving the scene of an accident involving injury, a Class A misdemeanor; and leaving the scene of an accident involving property damage greater than $400, a Class C misdemeanor. The trial court also found that the appellant violated the implied consent law. After a sentencing hearing, the trial court sentenced him to two years for DUI; eleven months, twenty-nine days for leaving the scene of an accident involving injury; and thirty days for leaving the scene of an accident involving property damage. The court ordered that the appellant serve the thirty-day sentence concurrently with the eleven-month-twenty-nine-day sentence but serve both of them consecutively to the two-year sentence. For violating the implied consent law, the trial court revoked the appellant's driver's license for one year.

## II. Analysis

### A. Officer Parks' Testimony

The appellant contends that the trial court erred by allowing Officer Parks, the prosecuting officer, to testify as the State's fourth witness. The appellant argues that case law required the officer to testify as the State's first witness. The State acknowledges that Officer Parks should have testified first. However, the State argues that the appellant has failed to show prejudice. We agree with the appellant that the officer should have testified as the State's first witness. However, we also agree with the State that the appellant has failed to show prejudice. Therefore, he is not entitled to relief.

Before the State's opening statement, the trial court asked if the rule of exclusion was

being called for, and the State answered yes. The trial court explained "the rule" to the witnesses and told them to wait outside the courtroom. Marquita Keck testified first for the State, followed by James Bomar and Sergeant Kylie. When the State announced that its fourth witness would be Officer Parks, the defense objected, arguing that Officer Parks, as the prosecuting officer in the case, should have testified first. The trial court noted that it had discretion "in determining the proper presentation of the witnesses." The court concluded that such an objection "certainly has to be raised before the State commits to its mode of presenting its witnesses" and that "[t]his Court is not going to let the State commit to its trial strategy and then in the middle of a trial spring the Mothershed decision." The trial court allowed Officer Parks to testify.

Tennessee Rule of Evidence 615 is the rule of sequestration and is "colloquially referred to as 'The Rule.'" Neil P. Cohen et al., Tennessee Law of Evidence, § 6.15[2] (6th ed. 2011). Rule 615 provides

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness

The purpose of the rule of sequestration is to "prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). The rule may be invoked at any time and is mandatory upon its invocation. See State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

Prior to the enactment of Tennessee Rule of Evidence 615 in 1991, our supreme court had explained the following regarding the rule of sequestration:

The attorney for the State has the right to such assistance as the prosecutor can give him in the management of the State's case, and, upon his request, it is not error to permit the prosecutor to remain in the courtroom after the rule has been called for; but the court should impose as a condition that the State, if it desires to use the prosecutor as a witness, should examine him first. The action of the court in the present case in declining to pursue this course was error, but, inasmuch as we cannot see that any substantial injury was done to the defense of the plaintiffs in error in the court below by such action, it cannot be treated as reversible error in the present case.

Smartt v. State, 80 S.W. 586, 588 (Tenn. 1903). In Mothershed v. State, 578 S.W.2d 96, 100-01 (Tenn. 1978), the court, citing Smartt, reiterated that a police officer testifying as the State's prosecuting witness is not subject to the rule but must testify first. More recently, this court explained,

"Smartt was decided when a testifying defendant was statutorily required to be the first witness for the defense. See Clemons v. State, 92 Tenn. 282, 21 S.W. 525 (1893). The rule in Smartt created a symmetry by preventing either party from having the advantage of a witness being able to conform his testimony with that of other witnesses. See Brooks v. State, 406 U.S. 605, 611, 92 S. Ct. 1891. That symmetry was ended in Brooks when the United States Supreme Court held that making the defendant testify first or not at all violated the defendant's right against self-incrimination and right to due process. Id. 406 U.S. at 611 n.5.

Although the defendant no longer need testify first, we believe the Smartt rule generally remains in effect as shown in Mothershed."

State v. Stephens, 264 S.W.3d 719, 738-39 (Tenn. Crim. App. 2007) (quoting State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 452, at **50-51 (Nashville, May 19, 2004)). "When a State's designated representative does not testify first, the Defendant is entitled to relief only if the Defendant can show prejudice as a result." State v. Reginald Fowler, No. E2009-00293-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 807, at *54 (Knoxville, Sept. 29, 2010) (citing Stephens, 264 S.W.3d at 739).

Turning to the instant case, the trial court ruled that the appellant waived this issue because he failed to object when the State did not present Officer Parks as its first witness. We disagree. Officer Parks was listed on the indictment as the prosecuting officer and remained in the courtroom when the State invoked the rule. However, the State, for whatever reason, could have decided not to call the officer to testify. If the State intended to have the officer testify, then it was the State's responsibility, not the appellant's responsibility, to call him as its first witness. The State's violation of the requirement in Smartt and Mothershed that the officer testify first did not become apparent until it called Officer Parks as its fourth witness. The appellant properly objected at that time, and the trial court should have excluded his testimony. We also note that the requirement in Mothershed is not within the discretion of the trial court.

Regarding prejudice, the appellant contends that Officer Parks "tailored his testimony to the State's theory of the prosecution and at trial seemed to remember the facts he wanted to remember and had problems remembering those he did not." As examples of this "tailoring," the appellant notes that Officer Parks had problems remembering the victim's injuries and the amount of alcohol the appellant said he consumed, despite having heard three State witnesses testify. The appellant also notes that on cross-examination, defense counsel asked Officer Parks, "And Sergeant Kylie who was here earlier, he didn't witness Mr. Asbury driving either, did he?" Officer Parks responded, "That's what he stated." We fail to see how either of these examples demonstrates that the officer was tailoring his testimony to that of the previous witnesses.

The appellant argues that it is "purely futile to suggest a defendant has to prove a witness improperly changed their testimony after hearing other witnesses testify. How is this to be done? Without an admission by a witness that he changed his testimony, a defendant could never properly invoke Mothershed." We disagree with the appellant. In this case, the defense cross-examined Officer Parks about his written reports and the video recording from his patrol car. The officer's trial testimony was consistent with both. The appellant has not cited to one example of the officer's changing his testimony after hearing the other witnesses testify. Therefore, we conclude that he has failed to demonstrate prejudice.

### B. Missing Evidence

Next, the appellant contends that the trial court erred by failing to dismiss the indictment against him or declare a mistrial when the State failed to provide the defense with the video from Sergeant Kylie's patrol car or offer the video into evidence. He also argues that the trial court should have given the jury a special instruction on the missing evidence. The State argues that the trial court properly found that the video never existed, and, thus, the trial court did not err by refusing to dismiss the indictment. Regarding the special jury

instruction, the State contends that the issue is waived and that, in any event, the trial court did not commit plain error. We conclude that the appellant is not entitled to relief.

During Sergeant Kylie's direct testimony, he said that when he first approached the appellant's truck, the appellant stepped out of the driver's side and had bloodshot eyes and slurred speech. He stated, "And if you get a chance to watch the video, you'll hear what I'm talking about." On cross-examination, he said that "unless you have my video, okay, the only video I saw was Officer Parks' video. Those statements would be reflected on my video." The defense asked Sergeant Kylie if he had the video from his patrol car, and he answered no. Later, the following exchange occurred:

Q    So the only statements that we have that put Mr. Asbury behind the wheel are not notated on a video.

A    They are notated on the video.

Q    Now, you would agree with me that video, if we were to offer that here as proof, the State has the burden to present that video; don't they?

A    It doesn't exist.

Q    Okay.    So the video doesn't exist as the statements that Mr. Asbury says he's driving on, correct?

A    At this time it does not. It did at one point.

Q    It's not here at this jury trial today?

A    You got it, sir. Yes, sir.

When court resumed the next day, defense counsel requested that the trial court dismiss the case pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), because the State failed to preserve the video. The defense argued that the video was exculpatory because it showed "whether or not [the appellant] was half out of the vehicle, completely out of the vehicle, what the definition of seated exactly was. Or what he was doing." The defense also claimed that the trial court should instruct the jury on a modified version of Tennessee Pattern Jury Instruction 42.16(a), the instruction for an absent material witness that allows

-12-

jurors to infer the witness would have testified unfavorably for the side that did not call the witness to testify. The State argued that there was no evidence the video ever existed, stating, "I believe [Sergeant] Kylie said there should have been a video. He never said he saw it. Never said it was destroyed, never said it was lost. From the State's [perspective] . . . there was no video. Tapes malfunction. Equipment malfunctions. That's not new for us." The State informed the trial court that it played for the jury the only video it possessed and that, in any event, nothing showed that a video from Sergeant Kylie's patrol car would have been exculpatory.

The trial court ruled that

> the officer's testimony was ambiguous or ambivalent with regard to the existence of the video. His testimony I think fairly interpreted was simply that he turned the video on, he believes that a video was created. He never saw the video. He had no idea what happened to the video. That is not proof -- clear and convincing proof the video ever existed. No one has -- is in a position, has come forward or been brought forward to say that they ever saw such a video. And the General's right, the video equipment does malfunction and to assume in the abstract that a good video was made and then subsequently lost or destroyed is untenable without some supporting evidence.

The trial court also concluded that nothing indicated the State had been negligent, overruled the appellant's motion to dismiss, and denied his request for a special jury instruction.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In Ferguson, 2 S.W.3d at 915-18, our supreme court addressed the issue of when a defendant is entitled to relief in the event the State has lost or destroyed evidence that was alleged to have been exculpatory. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Ferguson, 2 S.W.3d at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id.

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id. We review a trial court's ruling on a motion to dismiss the indictment for an abuse of discretion. State v. Harris, 33 S.W.3d 767, 769-70 (Tenn. 2000).

If a video of Sergeant Kylie's initial interaction with the appellant was made, then the State had a duty to preserve the recording. However, the trial court found that Sergeant Kylie's testimony about the existence of the video was ambiguous. The officer said the video existed "at one point." Nevertheless, as noted by the trial court, he also said he had never seen the video. Although the officer obviously believed the incident was being recorded, the State advised the court that it did not have the video and alluded that the video never existed due to mechanical malfunction. The officer did not say that the video had been lost or destroyed, and the defense made no attempt to find out what happened to the video. Therefore, we cannot say that the trial court erred by concluding the video did not exist. Moreover, assuming arguendo that the video existed, nothing indicates the degree of negligence involved in the State's failing to preserve it. Finally, the appellant stated on Officer Parks' video that he was driving the truck. Therefore, we cannot say that the trial court erred by denying the appellant's motion to dismiss the indictment.

The appellant also contends that the trial court erred by failing to declare a mistrial. A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse

appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In this case, the appellant never specifically requested a mistrial. See Tenn. R. App. P. 36(a). In any event, given the trial court's conclusion that the video never existed, a clear and unequivocal rule of law was not breached. State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); see Tenn. R. App. P. 36(b).

Regarding the appellant's request for a special jury instruction, the State contends that the issue is waived because he failed to make his special request in writing. We agree. See State v. Vickers, 985 S.W.2d 1, 8, (Tenn. Crim. App. 1997). Regardless, Ferguson provides that if a trial court concludes a trial without the missing evidence would not be fundamentally fair, then the court can instruct the jurors that they can infer the missing evidence would be favorable to the defendant. However, given that we cannot say the trial court erred by concluding the video never existed, the trial court also did not err by refusing to instruct the jury on the missing evidence.

## C. Sufficiency of the Evidence

The appellant contends that the trial court should have granted his motion of judgment of acquittal and motion for new trial because the evidence is insufficient to support the DUI conviction. Specifically, he argues that the evidence is insufficient because no one saw him operating the truck, he did not complete any field sobriety tests, he refused to take a blood test, and the State lost the video showing his initial confrontation with Sergeant Kylie. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant

-15-

has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

The indictment alleged that the appellant committed DUI by driving and being in physical control of a motor vehicle on a public roadway and premises generally frequented by the public at large while he was under the influence of an intoxicant. Tennessee Code Annotated section 55-10-401(a)(1), the DUI statute, provides, in pertinent part, that "[i]t is unlawful for any person to drive or to be in physical control of any automobile or other motor vehicle on any of the public roads and highways of the state . . . or any other premises frequented by the public at large, while [u]nder the influence of any intoxicant[.]"

Taken in the light most favorable to the State, the evidence shows that on the night of August 9, 2006, the appellant was driving his pickup truck near the intersection of Clinton Highway and Schaad Road in Knoxville. James Wiley was a passenger in the truck. The appellant traveled through the red traffic light at the intersection, hit Marquita Keck's car, and traveled south on Clinton Highway. The appellant did not stop until he got to the Gas Mart. Sergeant Kylie and Officer Parks arrived at the Gas Mart, and the appellant admitted that he had consumed alcohol and struck Keck's car. The appellant smelled of alcohol, had bloodshot eyes, had slurred speech, and was unsteady on his feet. He refused to perform field sobriety tests and would not consent to a blood test, so Officer Parks arrested him. Neither the appellant nor Wiley informed anyone before trial that someone other than the appellant had been driving the truck. In fact, Wiley contacted the district attorney's office and reported that the appellant had tried to pursuade him to claim he was driving the truck. Several defense witnesses testified that Sharon Hammons was driving the truck when it left Harrison's restaurant, and the appellant, Wiley, and Hammons testified that she was driving at the time of the wreck. However, the jury obviously accredited the testimony of the State's witnesses, as was its prerogative. The evidence is sufficient to support the DUI conviction.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-16-